[Cite as *State v. Telego*, 2018-Ohio-254.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 16 MA 0171 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DEVIN TELEGO, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
                            Common Pleas of Mahoning County,
                            Ohio
                            Case No. 16 CR 531

JUDGMENT:                   Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
                            Mahoning County Prosecutor
                            Atty. Ralph Rivera
                            Atty. Nicholas Brevetta
                            Assistant Prosecuting Attorney
                            21 West Boardman St., 6th Floor
                            Youngstown, Ohio 44503

For Defendant-Appellant:     Atty. Wesley Johnston
                            P.O. Box 6041
                            Youngstown, Ohio  44501

                            Atty. Eric Hall
                            P.O. Box 232
                            Medina, Ohio 44258

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                            Dated:  January 22, 2018

ROBB, P.J.

{¶1}   Defendant-Appellant Devin Telego appeals his conviction of felony child endangering in the Mahoning County Common Pleas Court.  He raises prosecutorial misconduct regarding certain questions asked of him when he testified in his own defense.  He also contends his attorneys rendered ineffective assistance of counsel by failing to retain a medical expert and by failing to request a sanction after one of the prosecution's medical experts was not present to testify at the end of the first day of trial.  For the following reasons, Appellant's conviction is affirmed.

STATEMENT OF THE CASE

{¶2}   On January 10, 2016, Appellant and his girlfriend brought their three-month-old child to the emergency room at St. Elizabeth Health Center in Austintown.  The emergency room physician ordered a CAT scan of the head, which showed a "brain bleed."  (Tr. 166, 170).  The scan showed fresh blood and evidence of older blood.  (Tr. 171).  A decision was made to transport the baby to Akron Children's Hospital in Akron.  The Austintown police were called, and a detective interviewed the parents at the local hospital.  The mother showed the detective a photograph of the smiling child taken one hour before they arrived at the hospital.  (Tr. 140).

{¶3}   Appellant told the detective the baby had been fussy for the past few days.  Just prior to coming to the hospital, his girlfriend and her friend went to the store, and he stayed home with the baby.  He left his second floor apartment to let his dog outside.  (Tr. 137).  When he came back, it appeared something was wrong with the baby.  He said the baby was not breathing, and he performed CPR.  (Tr. 138).  He reported the baby then seemed fine but was crying.  (Tr. 139).

{¶4}   The director of pediatric neurosurgery at Akron Children's Hospital observed the child in acute distress from intracranial hypertension (high pressure in the head) due to the subdural hematoma seen on the CAT scan.  (Tr. 181).  The treatment for a subdural hematoma ranges from observation to surgery, depending on the size and patient's symptoms.  (Tr. 183).  The baby's condition was life threatening with the bleeding and the clot pushing the brain over to suppress respiratory and heart drive functions.  (Tr. 187, 215).  In order to evacuate the

hematoma, the neurosurgeon performed a craniectomy (removing a section of skull bone), opened the dura (the brain covering), suctioned the liquid blood, and removed the clotted blood. (Tr. 183-184). During surgery, she was able to confirm the presence of an older injury (the blood clot) and a newer, acute injury (the active bleeding) as seen in the CAT scan. (Tr. 184-185, 189).

{¶5} The neurosurgeon explained how the older blood clot separated the dura from the brain causing a space where large blood vessels are located and stretching those vessels, which contributed to the sheering of two blood vessels from their anchor. (Tr. 197, 208-209). According to her opinion, the older trauma may have occurred two to three weeks earlier, and the new trauma occurred within hours of the baby coming to the hospital. (Tr. 184-185, 188-189, 208). The neurosurgeon opined, even if the prior injury made the blood vessels more susceptible to a new bleed, the amount of force required to rip the blood vessels from their anchor would be enough to cause a subdural hematoma regardless of whether an old subdural hematoma existed. (Tr. 210). The trauma required to cause each condition is not something experienced in the normal life of a three-month-old baby. (Tr. 212).

{¶6} After surgery, the baby was evaluated by the director of the Child Advocacy Center of Akron Children's Hospital (Boardman). The baby's breathing was still being assisted after surgery, and the baby exhibited an abnormal foot reflex (clonus), which suggested a neurological injury from the brain moving. (Tr. 292, 296-297). He believed the older brain injury could have occurred as early as three to ten days before the new injury. (Tr. 294). A violent shaking is the predominant cause of subdural hematoma in children of this age. (Tr. 293). In addition to the conditions noted in radiology and surgery, retinal hemorrhages were found in a pattern suggestive of a violent shaking; other causes were not indicated by the blood work. (Tr. 294-295, 320-321). This physician said the shaking necessary to cause the baby's subdural hematoma was such that a reasonable person would clearly know they are likely to harm or kill the baby. (Tr. 293). He diagnosed a shaking injury or abusive head trauma (through child abuse). (Tr. 299).

**{¶7}** The detective interviewed Appellant within a week of first speaking to him at the emergency room. Appellant insisted he did not shake the baby. (Tr. 142). He explained to the detective how he played with or calmed the baby by playing airplane. Appellant demonstrated the move for the detective, and the detective demonstrated it for the jury. He would hold the baby chest high, drop the baby in a free fall, and catch the baby before he hit the floor. (Tr. 142-144). Appellant said he would bounce while holding the baby close. (Tr. 143, 158).

**{¶8}** In May 2016, Appellant was indicted on three alternative counts of child endangering for the injury occurring on or about January 10, 2016: (1) creating a substantial risk to his child by violating a duty, a third-degree felony due to the serious physical harm; (2) child abuse, a second-degree felony due to the serious physical harm; and (3) child abuse by torture or cruelty, a second-degree felony due to the serious physical harm. *See* R.C. 2919.22(A), (B)(1), (B)(2), (E). The above testimony was presented by the state at the October 2016 jury trial, along with the following additional testimony.

**{¶9}** Appellant's girlfriend (the baby's mother) testified she lived with Appellant and their baby in Austintown at the time of the baby's injury. The baby's mother worked until 1:00 or 2:00 p.m. on Sunday, January 10, 2016. Appellant was off work on Sunday, and he stayed home with the child. The baby's mother said: the baby was "really fussy" when she got home; the baby fell asleep for 20 minutes after she fed him and woke up crying for hours; and he was usually a "really good baby." (Tr. 221, 224). She got the baby to smile at 7:19 p.m. and took a photograph of him smiling, which she showed to the detective and which was introduced as an exhibit at trial. (Tr. 235). Her friend came over to visit. Around 8:00 p.m., she put the baby in an upright child seat in the living room and went to the gas station with her friend; she estimated they were gone for 20 minutes. (Tr. 221, 225).

**{¶10}** When they returned from the store, Appellant was frantically pacing between the living room and dining room; she said he was trying to locate his phone to call 911. (Tr. 228, 245). She asked if Appellant put the baby to bed, and he responded, "no, he's freaking out." (Tr. 228). She heard "weird noises" coming from

the bedroom and ran to find the baby with his eyes closed and producing a "weird cry" or moan she "never heard before." (Tr. 228-229). When she picked up the baby, his head fell back and his eyes did not open. (Tr. 229). Her first thought was to bring the baby to the emergency room. She described Appellant as scared. (Tr. 230). At some point, Appellant voiced the baby would be fine and told her he saw the baby's eyes open. She did not see this occur. When the baby made the noise again, she put him in his car seat carrier to leave. When asked if she or Appellant ever abused the child, she answered in the negative. (Tr. 246).

{¶11} Her friend watched the child for them when they both worked. The friend testified the baby seemed well when she stopped over to visit that Sunday. When they returned from the short trip to the gas station, Appellant was pacing in the living room. The friend said Appellant did not say anything about the baby. (Tr. 255). She followed the baby's mother who ran into the bedroom upon hearing the baby. (Tr. 256, 259). She said the baby was unconscious and struggling to breathe by gasping. (Tr. 251, 256). The friend testified the baby's mother kept asking Appellant what was wrong with the baby, and he responded by punching a hole in the wall. (Tr. 261-262). When the baby's mother placed the baby in the car seat, the friend went to her vehicle to install the car seat base. When she reentered the apartment, Appellant had the baby out of the car seat saying he was fine, which she found odd. The baby's mother put him back in the car seat, and they all left for the emergency room. (Tr. 257).

{¶12} Appellant took the stand in his own defense. He noted he worked all day on Friday, and the baby's mother worked in the morning, during which time the friend watched the baby. (Tr. 337). Appellant retrieved the baby and the baby's mother from her father's house at 9:30 p.m. on Friday. He said the baby felt hot and did not eat well. (Tr. 338-339). He was with the baby Saturday while the baby's mother worked. He said the baby woke up every five minutes Saturday night and he slept holding him in a chair. (Tr. 341-342). On Sunday, the baby would only sleep in his arms. He retrieved the baby's mother from work around 2:00 p.m. He said a car ran a red light on their way home, causing him to slam on the brakes; he said the

baby slept through this. (Tr. 344). The friend came over on Sunday. Appellant testified the three of them all played with the baby using the airplane ride described earlier. (Tr. 348).

{¶13} When the girls left for the store, Appellant made the baby a bottle and propped it up for the baby in the bedroom; he said the baby was grumpy. (Tr. 350-351). When he returned from letting the dog outside, the baby was crying, sweaty, and hot. He said nothing would work to calm the baby, such as rocking, bouncing on his shoulder, and airplane. He said the baby then passed out and stopped breathing while he was holding him. (Tr. 353). Appellant described how he performed CPR with two presses of two fingers and a breath in the mouth; he said the baby gasped for air after the second sequence. He testified he put the baby in the playpen in order to look for his phone to call for an ambulance, at which point the baby's mother and the friend returned from the store. (Tr. 355). He said the baby's mother asked him what was wrong when she saw him with his hands on his head and tears on his face, and he said the baby was in the bedroom. (Tr. 355-356). He explained he removed the child from the car seat when he saw him open his eyes for a second and smile. Appellant attested he did not cause the trauma to the baby. (Tr. 359). He also denied punching a hole in the wall. (Tr. 362).

{¶14} The jury found Appellant guilty of count one child endangering for recklessly creating a substantial risk to the health or safety of his child by violating a duty of care, protection, or support which resulted in serious physical harm. *See* R.C. 2919.22 (A), (E)(2)(c) (elevating a first-degree misdemeanor to a third-degree felony where there was serious physical harm). The jury could not reach a verdict on counts two and three, the second-degree felony child abuse charges. The state agreed no subsequent trial would occur. (Tr. 432). The court sentenced Appellant to the maximum prison term of 36 months. Appellant filed a timely notice of appeal from the October 13, 2016 sentencing entry.

ASSIGNMENT OF ERROR ONE: PROSECUTORIAL MISCONDUCT

{¶15} Appellant sets forth two assignments of error, the first of which contends:

"The State of Ohio committed prosecutorial misconduct by cross-examining Defendant-Appellant on alleged photographs which were never introduced as evidence during the trial and misstated witness testimony. Said trial misconduct constituted plain error."

{¶16} As aforementioned, testimony was presented by the friend of the baby's mother. When asked if Appellant explained what happened to the baby upon their return from the store, she answered: "No. [The baby's mother] kept asking him, you know, what's wrong with [the baby]. And Devin punched a hole in his wall." (Tr. 261). She was then asked, "You said that Devin punched a hole in the wall?" to which she responded, "Yes, he did." An objection was entered when she was asked why Appellant did this. The court said she could answer if she knew why. (Tr. 262). She suggested she did not know why he punched the hole in the wall but it appeared to be a reaction to the baby's mother raising her voice. (Tr. 262-263).

{¶17} In cross-examining Appellant, the prosecution asked if people become irritable when they do not sleep. After he agreed, the following took place:

Q  Now, you heard the testimony from [the friend] that she saw you punch a hole in the wall when she and [the baby's mother] arrived home, correct?

A  I did not.

Q  You did not do that?

A  No, I did not.

Q  Okay. So if I have photographs of a hole punched in the wall, those are made up?

A  Yes. (Tr. 362-363).

{¶18} Appellant raises two arguments. The first argument is based upon a misreading of the friend's testimony. He states the prosecution mischaracterized her testimony by asking him if he heard her testify she saw him punch a hole in the wall because she previously testified she did not know if Mr. Telego had punched a hole in the wall. However, as can be seen from our review of the testimony, she twice

said he punched a hole in the wall and suggested she was not exactly sure "why" he did so. As such, there was no mischaracterization of her testimony.

{¶19} The second argument is based upon the prosecutor's reference to photographs which were not introduced into evidence. Appellant suggests there were no such photographs (calling them "alleged photographs") and accuses the state of misconduct. He asserts the reference to photographs never placed in evidence erroneously demonstrated to the jury that he lied to them about punching a hole in the wall, which seriously undermined and damaged his credibility. He concludes this violated his right to a fair trial. Appellant recognizes the absence of an objection on this topic below and asserts plain error under Crim.R. 52(B), which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

{¶20} The state responds the prosecution must have a good faith basis for its questions but need not lay an evidentiary foundation for every question. The state urges the friend's testimony provided a factual basis for the question asked during cross-examination of Appellant. The state concludes the question did not meet the test for prosecutorial misconduct as a contested remark must be improper and affect substantial rights but the remark here was harmless, considering the friend's testimony. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

{¶21} In general, the failure to object to prosecutorial questioning at trial waives all but plain error. *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710, 720 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804 (1978), paragraph three of the syllabus. An appellate court's invocation of plain error is discretionary and requires the existence of an obvious error which affected substantial rights. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

**{¶22}** A claim of prosecutorial misconduct is not reversible unless the prosecutor's challenged act injected the trial with unfairness so as to constitute a denial of due process. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 257. A two-pronged test is applied asking: (1) whether the conduct was improper, and (2) whether it prejudicially affected the defendant's substantial rights considering the context of the entire trial. *Id.* The key concern is "the fairness of the trial, not the culpability of the prosecutor." *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶23}** "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case." *State v. Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983). "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). "A questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." Evid.R. 607(B).

**{¶24}** On allegations of prosecutorial misconduct during questioning of the defendant, it has been concluded, "a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists." *State v. Gillard*, 40 Ohio St.3d 226, 230-231, 533 N.E.2d 272, 277 (1988) (finding it was not prosecutorial misconduct "to ask [the defendant] questions without presenting evidence of the allegations implied therein after [the defendant] had denied them").[1] The Court pointed out how "effective cross-examination often requires a tentative and probing approach to the witness' direct testimony, and this cannot always be done with hard proof in hand of every assumed fact." *Gillard*, 40 Ohio St.3d at 231, quoting *Hazel v. United States*, 319 A.2d 136, 139 (D.C.App.1974).

**{¶25}** Furthermore, where the prosecutor's good-faith basis for asking the contested questions of the defendant was not challenged below, the reviewing court

---

[1] *Gillard* was abrogated on other grounds in *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997) (on topic of residual doubt instruction for death penalty).

is to presume the prosecutor had a good faith basis. *Gillard*, 40 Ohio St.3d at 231 (reversing the court of appeals). *See also McKelton*, 148 Ohio St.3d 261 at ¶ 258 ("Because [the defendant] did not raise this objection at trial, the prosecutor did not have an opportunity to explain the basis for his questions on the record. Under these circumstances, we presume that a good-faith basis existed.").

**{¶26}** Here, the prosecutor's good faith basis for asking about Appellant punching a hole in the wall was contained in the record. And, the prosecutor was not required to lay an evidentiary foundation by introducing photographs, even when he said, "If I have photographs * * *." Appellant essentially argues the prosecutor improperly implied the actual existence of photographs of a hole in Appellant's wall without a good faith basis for doing so (as there was no evidence photographs existed). Although challengers on this topic can protest innuendo, we note the prosecutor's question was conditional as it began with, "So if I have photographs * * *" (which could be considered distinct from, "So the photograph I have * * *"). We additionally note defense counsel chose to address the topic in closing argument by stating the prosecutor "tried an old prosecutor trick" by asking the defendant "if I have pictures of it, then they're wrong?" Defense counsel stated: "There are no pictures. There were no pictures. And there was never a hole in the wall. Because [the friend] is lying for reasons known only to her." (Tr. 381).

**{¶27}** It is unknown whether there were photographs of the hole due to the lack of an objection. We are instructed to presume a good faith basis in such a scenario. Moreover, considered in the context of the entire trial, the contested question would not have deprived Appellant of a fair trial even if there were no photographs. A witness testified Appellant punched a hole in his wall upon being questioned by the baby's mother (in an upset and raised voice) about what was wrong with their unconscious three-month-old child as she was preparing to bring the child to the emergency room. The crux of the challenged question had a rational basis. Appellant's substantial rights were not affected. Accordingly, the trial court was not required to recognize plain error on this topic, and we do not find plain error. This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO:  INEFFECTIVE ASSISTANCE

**{¶28}** Appellant's second assignment of error alleges:

"DEFENDANT-APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

**{¶29}** We review a claim of ineffective assistance of counsel under a two-part test which requires the defendant to demonstrate:  (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance.  *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Both prongs must be established; if the performance was not deficient, then there is no need to review for prejudice and vice versa.  *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶30}** In evaluating the alleged deficiency in performance, our review is highly deferential to counsel's decisions as there is a strong presumption counsel's conduct fell within the wide range of reasonable professional assistance.  *Bradley*, 42 Ohio St.3d at 142-143, citing *Strickland*, 466 U.S. at 689. We are to refrain from second-guessing the strategic decisions of trial counsel.  *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).  Instances of debatable trial strategy very rarely constitute ineffective assistance of counsel.  *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987).  There are "countless ways to provide effective assistance in any given case."  *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 689.

**{¶31}** To show prejudice, a defendant must prove his lawyer's deficiency was so serious that there is a reasonable probability the result of the proceeding would have been different.  *Carter*, 72 Ohio St.3d at 558.  Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Bradley*, 42 Ohio St.3d 136 at fn. 1, quoting *Strickland*, 466 U.S. at 693.  Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was

fundamentally unfair due to the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Furthermore: "A claim of ineffective assistance of counsel in a direct appeal must be established by the evidence in the record." *State v. Carter*, 7th Dist. No. 15 MA 0225, 2017-Ohio-7501, ¶ 78, citing, e.g., *State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001) (if establishing ineffective assistance of counsel requires proof outside the record, then the claim is not properly considered on direct appeal). *See also State v. Ishmail*, 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (review is limited to what transpired below as reflected by the record on direct appeal).

**{¶32}** Appellant raises two claims of ineffective assistance of counsel. First, he contends his attorneys should have filed a motion requesting funds for a medical expert and should have retained a medical expert. He reviews the testimony presented by the three physicians called as witnesses by the state. He suggests a medical expert should have been utilized by the defense to rebut their testimony. The state responds the decision could be considered part of the trial strategy and there were no indications of deficiency or prejudice by counsel relying on cross-examination in order to construct a defense.

**{¶33}** "[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66; *State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001); *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Even if the wisdom of this approach is debatable in a particular case, it must be remembered that debatable trial tactics require deference to counsel's judgment. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). It is often pointed out defense counsel's decision not to engage its own expert can be considered tactical since the potential expert may uncover evidence further inculpating the defendant. *See, e.g., Hartman*, 93 Ohio St.3d at 299. *See also State v. Phillips*, 6th Dist. No. WD-16-020, 2017-Ohio-7107, ¶ 48; *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691, ¶ 90 (10th Dist.). Furthermore,

the argument that a defense expert was necessary to impeach the testimony of the state's experts can be considered "purely speculative" where there is no indication in the record who the defense expert should have been or what they would have said. *Hunter*, 131 Ohio St.3d 67 at ¶ 66.

**{¶34}** Here, Appellant was represented by two defense attorneys at trial. Defense counsel relied on the testimony of the three physicians involved in the baby's care and cross-examined each of these witnesses, emphasizing certain testimony provided on direct examination as favorable to the defense, such as the old injury which stretched the blood vessels. The tactic of disputing the treating physicians by calling a defense expert is not a required standard of representation. It is an acceptable tactic to refrain from disputing the medical aspects of their testimony and focus on exactly what the testimony suggests or does not suggest as pertinent to the facts of the particular case at bar. This was the strategy here, as outlined in closing argument. (Tr. 376-377). The decision to utilize the testimony of the three physicians already involved in the baby's care rather than retain another physician was a matter of trial preparation and strategy and did not constitute deficient performance. We note the jury did not return guilty verdicts on the two higher-degreed child endangering counts. Additionally, Appellant has not demonstrated a reasonable probability the result would have been different if a defense expert had been utilized. The value of any potential testimony from some other, unknown physician is speculative. In accordance, Appellant's first argument is without merit.

**{¶35}** Appellant's second argument of ineffective assistance of counsel revolves around the state's final witness, the former director of the Child Advocacy Center. At the time of trial, this physician was working as the chief of child abuse pediatrics at a medical university in South Carolina. He had cerebral palsy and was in a wheelchair. He was subpoenaed to appear to testify at trial on October 3, 2016 at 8:30 a.m. On that day, jury selection began at 8:36 a.m. and was completed at 10:50 a.m. (Tr. 2, 102). After opening statements, the state presented the testimony of the detective, the emergency room physician, the neurosurgeon, the baby's mother, and her friend. At some point, the prosecution advised the court's bailiff that

the final witness was on a flight and would not be present to testify until the next morning. At approximately 3:00 p.m., the court sent the jury from the courtroom to address the whereabouts of the prosecutor's final witness.

{¶36} The court noted how the jurors had been assured their time would not be wasted. The court also noted the lawyers were asked by the bailiff that morning if there was anything they needed to speak to the court about, but the prosecution did not reveal this issue. (Tr. 264-265). The court reminded the assistant prosecutor: "You don't run my court * * * I need to know what's going on." (Tr. 265). The court inquired: "You knew he wouldn't be here today to testify. * * * When would I get to know that?" (Tr. 266).

{¶37} The prosecutor advised the court the witness was on a flight to this area in order to testify in the morning. (Tr. 264). He envisioned the neurosurgeon's testimony would have taken longer, and he did not realize until after her testimony that the final witness might be called the first day of trial. (Tr. 266, 269). The court scolded, "That's not something you do as you go along. It's something I need to know before we start." (Tr. 267). The court noted its options ranging from proceeding without the witness to excusing the jury early and resuming in the morning. (Tr. 265, 267, 269). The court also inquired why the prosecution informed the bailiff the final witness's testimony would take three to four hours. (Tr. 270, 272). The assistant prosecutor said this was the state's primary witness. (Tr. 270). The court voiced suspicion about the motive for what it viewed as an overly-high estimate of the time necessary to examine the witness. (Tr. 273-274).

{¶38} The court asked the defense if it wished to say anything before the court decided what to do. Defense counsel said they found out "this morning" the witness would not be available to testify until tomorrow. One of the attorneys noted, "I was quite aware of [the physician's] participation in this trial." He advised, "I'm not going to quarrel with his presentation." He also opined there was "no way" the testimony would take three hours, estimating it would take a maximum of one hour. (Tr. 273).

**{¶39}** The court revealed it was "tempted to impose a sanction" otherwise "you never learn." (Tr. 274-275). In the end, the court recessed for the day and ordered the case to resume at 8:00 a.m. The court limited the state to one hour with the final witness. (Tr. 275). The court warned the state to get timely pre-approval of the court on the matter of witness scheduling in the future. (Tr. 276).

**{¶40}** On appeal, Appellant contends defense counsel should have moved the trial court to impose the sanction of precluding the witness from testifying. However, there is no indication such a request would have been successful based upon any defense argument and thus no indication of deficiency or prejudice. The trial court expressed its displeasure over the perceived disrespect for the court's protocol and scheduling. The concern was not with the effect of the early recess on the defense. There was no issue of notice, i.e., this was not a discovery issue. As defense counsel conceded, he was fully informed the physician would be testifying at trial. Even in the case of a discovery violation, a court should impose the least severe sanction if possible. *See State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971 (2013), applying *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of syllabus.

**{¶41}** Furthermore, the jury would not have attributed the delay to the defense as the court informed the jury the state failed to inform the court its witness was on a plane. (Tr. 276-277). It is noteworthy that the trial would not have concluded on the first day even if the state's witness was immediately available as can be seen by the following facts: the witness would have been called to testify around 3:00 p.m.; the court recessed for the day instead; the court reopened at 8:00 the next morning; and the jury did not reach a verdict until 5:27 p.m. In fact, the defense may have benefitted from the extra time this provided the defendant to prepare for his own testimony, which otherwise would have taken place immediately had the court precluded the state's witness from testifying. Deficient performance is not apparent. In addition, there is no indication the results were unreliable or fundamentally unfair merely because defense counsel did not further encourage the trial court's anger at the prosecution. *See, e.g., Carter*, 72 Ohio St.3d at 558, citing *Lockhart*, 506 U.S. at

369. Appellant's second ineffective assistance of counsel argument is without merit, and Appellant's second assignment of error is overruled.

**{¶42}** For the foregoing reasons, the trial court's judgment is affirmed.


Waite, J., concurs.

DeGenaro, J., concurs.