[Cite as *State v. Simko*, 2021-Ohio-1447.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 18CA011267 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JULENE SIMKO | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 14CR090802 |

DECISION AND JOURNAL ENTRY

Dated: April 26, 2021

HENSAL, Judge.

{¶1} Julene Simko appeals her convictions from the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Around 6:00 a.m. on Wednesday, November 18, 2009, someone shot Jeremy Simko in the back of the head at point-blank range while he was sleeping in his bed, killing him. His wife, Julene Simko, called 911 a few minutes later. Ms. Simko was screaming and crying, telling the 911 operator that someone shot her husband, and begging first responders to hurry. Almost five years later, in October 2014, Ms. Simko was charged with her husband's murder. Almost three years after that, in September 2017, the matter proceeded to a multi-day bench trial. After the presentation of testimony from multiple witnesses on behalf of the State and none on behalf of the defense, the trial court found Ms. Simko guilty of one count of aggravated murder, two counts

of murder, two counts of felonious assault, and one count of tampering with evidence, all with accompanying firearm specifications. This appeal followed.

{¶3} Having summarized the relevant procedural posture of this case, we now turn to the evidence presented at trial. We will begin with a discussion of the evidence relating to the Simkos' relationship, the security measures they took at their house and adjacent barn, their financial situation at the time of the murder, and their sexual proclivities, which the State relied upon to establish a motive.

{¶4} Ms. Simko and Jeremy had been married for about 10 years at the time of the murder and, according to witnesses, were best friends. They owned and operated a tree service business and spent most of their time together. Jeremy was described as a "hothead" who could create enemies, cursed at workers on job sites, and was loud, strict, and demanded perfection. According to Ms. Simko, however, Jeremy did not mistreat her during their marriage, and he had no known enemies at the time of his death. Ms. Simko admitted that Jeremy slapped her one time near the beginning of their marriage, that she slapped him back, and that it never happened again.

{¶5} The Simkos lived in a relatively rural area in a house with a basement, two full stories, and a third-floor loft. Next to the house was a barn where they stored some of their business equipment. Because of past break-ins at their barn, the Simkos set up a variety of "[t]op notch" security measures on their property. This included a gate that blocked access to their driveway, a sensor on their driveway that was connected to speakers in the house and barn that would emit a loud, five-second-long tone when triggered, a security camera at the front of the house that pointed toward the driveway, a security camera at the back of the house that pointed toward the barn, and sensors on each of the four doors on the first floor of their house, which were connected to speakers that would emit three beeps in rapid succession each time a door was opened. There were two

speakers for the door sensors: one on the first floor, and one near a couch on the third-floor loft. The Simkos also had four "vicious" looking dogs who were "very alert all of the time[,]" and would bark at people approaching the property. Each dog had a separate dog house on the perimeter of the property and would be secured to those houses with a chain at night. The Simkos also had "[n]o trespassing" signs along their driveway and a sign for a security company. Their home-security system, however, was inactive; although the doors chimed when opened, the system was not monitored by an external company. In addition to these security measures, the Simkos owned several guns and both had their concealed-carry permits. They stored some of their guns in a safe on the first floor of their house, and others were kept loaded in other parts of the house, including a 9mm stored in one of nightstands in their second-floor bedroom, and a .357 magnum that was sometimes stored in a holster in a china cabinet on the first floor.

{¶6} Around the time of the murder, the Simkos were attempting to secure a loan from the bank to purchase numerous acres of vacant land adjacent to their property, which they already used as their own. They were having difficulty securing a loan, however, due to some late payments on their credit report. Ms. Simko indicated that this caused some stress, but not between her and Jeremy. A few days prior to the murder, the bank denied the Simkos' loan application.

{¶7} Regarding their sexual proclivities, the police discovered a handwritten master-slave/father-daughter agreement in the house written by Jeremy and Ms. Simko. The agreement indicated that Ms. Simko would be submissive to Jeremy, detailed various sexual acts that Ms. Simko purportedly consented to, set forth certain grooming habits she was required to maintain, and indicated that Ms. Simko consented to having her genitalia stretched and measured. The police also discovered numerous pornographic pictures and videos in the house, which the State maintained depicted sadomasochism, and appeared to depict Ms. Simko in a state of distress. This

caused concern for the police, who were aware that Ms. Simko had been sexually abused by her father as a child. Ms. Simko, however, maintained that she and Jeremy had an active sex life, enjoyed role playing, and that she was a willing participant in these sex acts. Additionally, Ms. Simko indicated that, through counseling, she had moved on from the sexual abuse she endured as a child.

{¶8} We now turn to the evidence presented regarding Ms. Simko's version of the events. The police interviewed Ms. Simko four times on the day of the murder: once at the scene, once at the hospital, and twice while she was at her mother's house. Investigators interviewed her again in 2013 prior to her being indicted for Jeremy's murder. According to Ms. Simko's statements to the police and investigators, she and Jeremy spent the day prior to his murder canning pumpkins. They watched television together that night, and Jeremy secured their four dogs to their respective dog houses on the perimeter of the property before coming inside, closing the kitchen door that led to their backyard, and going to bed. Ms. Simko indicated that either she or Jeremy would have locked the kitchen door, which was always their practice. In her 2013 interview, Ms. Simko indicated that both she and Jeremy took sleeping pills prior to going to bed. According to the coroner, the toxicology report indicated that Jeremy had a "very, very low level" of Benadryl in his system, which was consistent with a minimal "sleep, or relaxation-inducing dose."

{¶9} Ms. Simko indicated that, at some point during the night, she left their second-floor bedroom and went to sleep on the couch on the third-floor loft. Her statements varied as to whether she did so because she was hot, Jeremy had been pushing her out of the bed, or because Jeremy was snoring. Regardless, her testimony was that she was in the loft area when she awoke to a loud noise. She initially assumed that Jeremy had shot at a coyote or some other animal from their bedroom window, which he had done in the past, so she waited a few minutes before going

downstairs to their bedroom. When she did, the room was dark and Jeremy was lying on the bed. When she went to wake him, she felt what she presumed was blood and knew something was not right. She then heard a loud noise coming from somewhere in the house, which sounded like something falling. She grabbed a 9mm gun from her nightstand, used the light from the alarm clock to locate and disengage the safety on the gun, and shot what forensics experts determined to be two shots into the hallway. Ms. Simko then grabbed Jeremy's phone from the nightstand and called 911. Ms. Simko stayed in the bedroom and on the phone with the 911 operator, who was instructing her to perform CPR, until the police arrived. We now turn to the events as detailed by the State's witnesses at trial.

{¶10}  When the police arrived, they unsuccessfully attempted to kick down the front door. They then went to the back door, which led into the kitchen, and noticed that the screen door was unlocked but closed, and that the internal door was open. Almost immediately upon entering, an officer noticed a .357 magnum on the kitchen floor. Unsure whether an assailant was still in the house, that officer picked up the gun, unloaded it, noticed one spent round, put the remaining rounds in a nearby shoe, and secured the gun in the small of his back. That officer admitted that doing so potentially compromised the evidentiary value of that gun, but indicated that officer safety takes priority over securing evidence. The police then proceeded to the second-floor bedroom where Ms. Simko was located. With the exception of that bedroom, there were no lights on in the house, which remained dark given the early hour (i.e., around 6:00 a.m.).

{¶11}  Upon entering the bedroom, the police observed Ms. Simko covered in blood and kneeling next to Jeremy's body, which – at the direction of the 911 operator – Ms. Simko had moved from the bed onto the floor. The police tried talking to Ms. Simko, but she was screaming, crying, and difficult to understand. She was eventually transported to the hospital while the police

continued to collect evidence and process the scene. While at the hospital, a nurse thought she heard Ms. Simko say that she shot her husband. That nurse asked Ms. Simko what she had just said, and Ms. Simko replied that someone shot her husband.

{¶12} Back at the scene, the police inspected the house for signs of forced entry but found none. With the exception of the kitchen door, all of the doors and windows remained locked. The police noticed that the door to the china cabinet on the first floor was slightly ajar, and that an empty gun holster that appeared to be the holster for the .357 magnum found on the kitchen floor was inside. Ms. Simko confirmed that the .357 magnum was their gun, and that she and Jeremy both qualified for their concealed-carry permits using that gun. The police also noticed that a chair in the kitchen had been knocked over, but that the purse that presumably had been on the chair was undisturbed. The police further noticed that there were no marks or dents on the kitchen floor or on the .357 magnum to indicate that the gun had been dropped by a fleeing intruder.

{¶13} The police reviewed the footage from the security cameras at the front and back of the house, which revealed no activity after someone – presumably Jeremy – secured the dogs around 10:00 p.m. the night before. The police also spoke with several neighbors, all of whom denied hearing the Simkos' dogs barking around the time of the murder. The defense attempted to challenge whether the dogs even barked when the police arrived, suggesting that – if they did not bark at the police – they might not have barked at a trespasser. An officer's dashcam, however, confirmed that the dogs barked while the police were present, albeit not incessantly. Additionally, the police found a pair of black gloves in the backyard near the house, as well as footprints in the woods that abutted the Simkos' property. The black gloves had both Ms. Simko and Jeremy's DNA on them and – according to a detective – someone followed up on the footprints, but they had no identifying marks.

{¶14}  Forensics experts found no foreign DNA at the scene (i.e., DNA that could not be attributed to Ms. Simko or Jeremy, or was otherwise suitable for comparison), and confirmed that the two shots Ms. Simko fired from their bedroom into the hallway came from the 9mm gun she had with her in the bedroom when the police arrived.  While it could not be conclusively established, a forensics expert testified that bullet jacketing found in the bedroom was consistent with having been fired from the .357 magnum found on the kitchen floor, indicating that the .357 magnum could have been the murder weapon.  The actual bullet, however, was never recovered, and there was no blood DNA on the .357 magnum, nor was there any other DNA that could be conclusively established from that gun.  A firearms expert testified that he observed no blowback from the wound on that gun, suggesting that the .357 magnum may have been wiped off.  The coroner, however, explained that he would not necessarily expect to see blowback on the gun from this type of wound (i.e., a gunshot wound to the back of the head fired from 1.5-2 inches away).  He explained that, per a study he read from the American Journal of Forensic Medicine and Pathology, twenty-five percent of contact or near-contact wounds do not result in blowback on the gun.

{¶15}  The police followed up on various tips they received, none of which were provided by Ms. Simko.  According to a neighbor, he noticed an unusual person walking around the area a few nights prior to the murder.  That person was on his cell phone, walked a few laps around a church, sat on the church steps, and was then picked up in a car.  The neighbor texted Jeremy about that person because he considered Jeremy to be the neighborhood watchman, but nothing came of it since the person left in a car and was not seen again.  The police also received a tip from a woman claiming that the Simkos' neighbor, J.B., had previously pointed a gun at her friend, and that the police should look into him.  That tip, however, was buried under paperwork for several years

before police followed up on it. When they did, the police discovered that J.B. had moved to southern Ohio. The police interviewed J.B. at his home. J.B. indicated that he had a friendly relationship with the Simkos, and that his former live-in girlfriend may have had a key to the Simkos' house at one point in order to feed the dogs when the Simkos were out of town. J.B. indicated that his former girlfriend had moved out about two years prior to the murder, and that he did not have a key to the Simkos' house. After that interview, the police excluded J.B. as a suspect, and J.B. passed away sometime before trial. The police also followed up on a tip that the murder was part of a drug deal gone bad, but found nothing to substantiate that tip.

{¶16} In light of evidence detailed above, the State's theory at trial was that Ms. Simko attempted to stage the crime scene to make it appear that an intruder entered the home and shot Jeremy. According to the State, it was not believable that someone would and/or could: bypass all of the security measures at the property; open the kitchen door without any sign of using force despite the fact that Ms. Simko indicated that the door would have been locked; enter the home undetected (i.e., without Jeremy or Ms. Simko hearing, at a minimum, the three-beep door chime) and unarmed; navigate through the dark house to the china cabinet to grab the .357 magnum from its holster; travel upstairs in the dark to the Simkos' bedroom, presumably knowing that Jeremy had taken a sleeping pill and was sleeping alone; shoot Jeremy in the head at point-blank range; place the .357 magnum on the kitchen floor gently enough so as to not damage the gun or leave any mark or dent on the floor; and flee the scene without stealing anything, or leaving any traceable DNA or fingerprints behind. The State also noted the apparent conveniences in Ms. Simko's version of the events, including the supposed fact that she took a sleeping pill hours before the murder, left the bedroom to sleep on the couch on the third-floor loft, and did not hear, at a minimum, the three-beep chime of the kitchen door opening. The State also challenged Ms.

Simko's explanation of certain facts, such as the fact that Ms. Simko told the police she had moved the 9mm gun in the days leading up to the murder because she had been cleaning the house in anticipation of a loan-related home appraisal. A representative for the bank, however, indicated that there was no appraisal scheduled. The State also pointed out the fact that, the evening before the murder, someone accessed Ms. Simko's father's (who had been sexually abusive toward her) obituary online, yet Ms. Simko denied doing so and had no explanation for how that happened. The State surmised that Ms. Simko was motivated to kill Jeremy based upon their financial struggles, which were evidenced by the recent denial of a loan, and/or based upon the sexual abuse Jeremy appeared to have perpetrated on her throughout their marriage.

{¶17} After several days of trial and the presentation of over a dozen witnesses, the State rested and the defense offered no witnesses. About a month later, the trial court rendered its verdict, finding Ms. Simko guilty on all counts. In doing so, the trial court explained its reasoning on the record, including its opinion that the State failed to establish a motive. The trial court noted that defense counsel brought up the possibility of other murderers during closing argument. It explained that, while possibilities are not probabilities, enough possibilities can rise to the level of reasonable doubt. The trial court, therefore, indicated that it felt compelled to not only explain how the evidence supported Ms. Simko's guilt, but also how the evidence precluded a finding that someone else committed the murder.

{¶18} The trial court explained that the other potential murderers were a stranger-robber or an assassin. The trial court concluded that there was insufficient evidence to support the stranger-robber or assassin theories, and that there was sufficient evidence, by proof beyond a reasonable doubt, that Ms. Simko murdered Jeremy. In doing so, the trial court indicated that, although it could not be conclusively established, it was convinced that the .357 magnum was the

murder weapon. It also noted several facts, including that: the murder occurred around 6:00 a.m., which is an unlikely time for a home break-in; a speaker for one of the security sensors was in the loft within a few feet of where Ms. Simko was allegedly sleeping, yet she did not hear it go off; there was no sign of forced entry despite the fact that Ms. Simko indicated that all of the doors would have been locked; a stranger-robber or assassin would have had to navigate inside of a dark house to find the murder weapon in the china cabinet, go upstairs, and fire the gun within two inches of Jeremy's head without knowing where his spouse was, or how deep of a sleep he was in; nothing had been stolen from the house; the murder weapon was left at the scene with no indication that it had been dropped by a fleeing intruder; and there was no third-party DNA found at the scene. Ms. Simko now appeals, raising five assignments of error for this Court's review. We will consider her first two assignments of error together.

## II.

### ASSIGNMENT OF ERROR I

THE COURT ERRED WHEN IT FOUND MS. SIMKO GUILTY OF ALL SIX COUNTS WHEN IT, ACTING AS THE TRIER OF FACT, APPLIED AN INCORRECT STANDARD OF LAW IN EVALUATING THE EVIDENCE IN VIOLATION OF MS. SIMKO'S CONSTITUTIONAL RIGHT TO DUE PROCESS.

### ASSIGNMENT OF ERROR II

THE COURT ERRED WHEN IT SHIFTED THE BURDEN OF PROOF TO THE DEFENSE BY REQUIRING THE DEFENSE TO IDENTIFY A POTENTIAL ALTERNATIVE MURDERER IN VIOLATION OF MS. SIMKO'S CONSTITUTIONAL RIGHT TO DUE PROCESS.

{¶19} In her first assignment of error, Ms. Simko argues that the trial court violated her constitutional rights by applying the wrong standard to convict her of the charged offenses. In her second assignment of error, Ms. Simko argues that the trial court violated her constitutional rights

by shifting the burden to the defense to establish that someone else committed the murder. For the reasons that follow, this Court disagrees.

{¶20} "Due process requires that the state establish beyond a reasonable doubt every fact necessary to constitute the crime charged[,]" including the identity of the perpetrator. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 36, citing *In re Winship*, 397 U.S. 358, 364 (1970); *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 24 ("The identity of a perpetrator must be proved by the State beyond a reasonable doubt."); R.C. 2901.05(A) ("Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution."). Here, Ms. Simko has not identified any element of the charged offenses that the State failed to prove beyond a reasonable doubt. Instead, she argues that the trial court did not apply the reasonable-doubt standard, and that it shifted the burden to her to prove that someone else committed the murder. She argues that the trial court essentially used process of elimination in order to convict her because it determined that, since the evidence did not support the stranger-robber or assassin theories, she, by default, must have murdered Jeremy.

{¶21} This Court's review of the trial court's reasoning does not support Ms. Simko's position that the trial court applied the wrong standard, or that it shifted the burden to her to prove that someone else committed the murder. While the trial court did spend considerable time on the record explaining how the evidence did not support the stranger-robber or assassin theories, it prefaced its analysis in that regard by indicating that defense counsel discussed the possibility of alternative murderers during closing argument. The trial court, therefore, indicated that it felt compelled to discuss those possibilities, which could lead to reasonable doubt as to whether Ms. Simko murdered Jeremy. After reviewing the evidence with those theories in mind, the trial court

rejected them and specifically determined that the State proved Ms. Simko's guilt by proof beyond a reasonable doubt. We, therefore, reject Ms. Simko's argument that the trial court applied the wrong standard, or that it shifted the burden to her to prove that someone else committed the murder. Ms. Simko's first and second assignments of error are overruled.

ASSIGNMENT OF ERROR III

THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶22} In her third assignment of error, Ms. Simko argues that the State failed to present sufficient evidence to support her conviction for aggravated murder.[1] This Court disagrees.

{¶23} Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶24} Revised Code Section 2903.01(A) governs aggravated murder and provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" "[T]he phrase 'prior calculation and design' * * * indicate[s] studied care in planning or analyzing

---

[1] We note that, while her assignment of error references the "verdict[,]" Ms. Simko's merit brief addresses her conviction for aggravated murder only.

the means of the crime as well as a scheme encompassing the death of the victim." (Alterations sic.) *State v. McCarley*, 9th Dist. Summit No. 23607, 2008-Ohio-552, ¶ 34, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997). A conviction for aggravated murder, like any criminal conviction, "can be based entirely or in part on circumstantial evidence." *State v. Schulman*, 10th Dist. Franklin No. 19AP-566, 2020-Ohio-4146, ¶ 45, citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). This includes the element of the identity of the perpetrator. *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9 ("As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." ). "Circumstantial evidence is 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" *Schulman* at ¶ 45, quoting *State v. Groce*, 10th Dist. Franklin No. 18AP-51, 2019-Ohio-1007, ¶ 29.

{¶25} Despite the fact that a sufficiency analysis is based upon whether the State met its burden of proof, Ms. Simko's argument is primarily based upon the trial court's explanation of its verdict, which it was not required to provide. She again argues that the trial court essentially used process of elimination to find her guilty, which this Court has already rejected in our resolution of Ms. Simko's first and second assignments of error. She then summarily concludes that the State failed to prove that she caused Jeremy's death, and that she did so with prior calculation or design. Aside from a recitation of the sufficiency standard and aggravated-murder statute, Ms. Simko has cited no law in support of her position.

{¶26} In the simplest of terms, the State presented evidence at trial indicating that Ms. Simko and Jeremy went to bed together in a locked house, that no one entered the house after they went to bed, and that Jeremy was shot with one of his own guns while he was sleeping. The State's

theory was that Ms. Simko got out of bed at one point, went downstairs, retrieved the .357 magnum from its holster in the china cabinet on the first floor, went back to their second-floor bedroom, and shot Jeremy in the back of the head while he slept, killing him. The evidence in this regard was mostly circumstantial, including facts indicating that the assailant by-passed the "[t]op notch" security measures at the property, there was no sign of forced entry into the house, there was no foreign DNA identified at the scene, Ms. Simko had access to and was familiar with the .357 magnum, the bullet jacketing found in the bedroom was consistent with having been fired from the .357 magnum, and the .357 magnum was found on the kitchen floor with no sign of having been dropped by a fleeing assailant. Viewing this evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of aggravated murder proven beyond a reasonable doubt. Ms. Simko's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶27} In her fourth assignment of error, Ms. Simko argues that her convictions[2] are against the manifest weight of the evidence. This Court disagrees.

{¶28} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th

---

[2] Ms. Simko's challenge to the manifest weight of the evidence is general in nature, referring to "these convictions" as opposed to specifically addressing each conviction.

Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *Thompkins*, 78 Ohio St.3d 380, at 387. An appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶29} Ms. Simko makes four primary arguments in support of her position that her convictions are against the manifest weight of the evidence. She argues that: (1) the trial court mistakenly thought the speaker for the door sensors (i.e., the speaker that emitted three beeps in rapid succession when a first-floor door was opened) near the couch on the third-floor loft was the speaker for the driveway sensor (i.e., the speaker that would emit a loud, five-second-long beep when the driveway sensor was triggered); (2) the police's investigation lacked competency as evidenced by the fact that none of the officers investigated the lack of blowback on the apparent murder weapon (i.e., the .357 magnum), and the fact that an officer handled that weapon without wearing gloves; (3) the reliability of the DNA testing was questionable since there was no foreign DNA identified in the house, yet an officer touched the apparent murder weapon without wearing gloves; and (4) the police assumed Ms. Simko was guilty from the moment they arrived on the scene. We will address each argument in turn.

{¶30} Regarding the driveway and door-sensor speakers, the record does reflect that the trial court confused the door-sensor speaker with the driveway-sensor speaker when it explained that there was a speaker within a few feet from where Ms. Simko was purportedly sleeping, yet she did not hear it go off. Defense counsel pointed this out during the sentencing hearing. The trial court acknowledged the possible mistake, but noted that the relevant fact was that there was

a speaker that would emit a tone within a few feet from where Ms. Simko was purportedly sleeping, regardless of which tone it emitted.

{¶31} Regarding the lack of blowback on the .357 magnum, Ms. Simko has not indicated what – if anything – the officers should have done to investigate that further, or how any further investigation in that regard would have affected the outcome of the trial. Additionally, her argument ignores the testimony of the coroner, who indicated that this type of wound (i.e., a gunshot wound to the back of the head fired from 1.5-2 inches away) would not necessarily result in blowback.

{¶32} Regarding the reliability of the DNA testing, the forensic expert testified that numerous factors impact whether DNA is transferred to an item, as well as whether enough DNA is present to allow for comparison. During cross-examination, the expert acknowledged that improper swabbing can occur, but there was no indication that improper swabbing occurred in this case.

{¶33} Lastly, regarding Ms. Simko's argument that the detectives assumed she was guilty from the moment they arrived, Ms. Simko relies solely on one statement from an officer who remarked that he thought Ms. Simko probably committed the murder. Even assuming that the detectives thought she was guilty from the beginning, this Court fails to see how that renders her convictions against the manifest weight of the evidence.

{¶34} Having reviewed the entire record, this Court cannot say that this is the exceptional case where the evidence weighs heavily against Ms. Simko's convictions. Ms. Simko's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

MS. SIMKO DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
AS GUARANTEED BY THE SIXTH AMENDMENT.

{¶35} In her fifth assignment of error, Ms. Simko argues that her trial counsel rendered ineffective assistance. This Court disagrees.

{¶36} To prevail on a claim of ineffective assistance of counsel, Ms. Simko must establish that: (1) her counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A deficient performance is one that falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A court, however, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). To establish prejudice, Ms. Simko must show that there existed a reasonable probability that, but for her counsel's errors, the outcome of the proceeding would have been different. *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138.

{¶37} As a general rule, trial counsel's decision not to call an expert witness will not establish ineffective assistance. *State v. Hanford*, 9th Dist. Summit No. 29204, 2019-Ohio-2987, ¶ 37; s*ee also State v. Coombs*, 9th Dist. Lorain No. 03CA008262, 2004-Ohio-441, ¶ 26 ("[T]he decision whether to call an expert witness is simply a matter of trial strategy."); *State v. Spaulding*, 9th Dist. Summit No. 28526, 2018-Ohio-3663, ¶ 52 ("[C]ounsel's decision to rely on cross-examination instead of calling an expert witness to testify is not ineffective assistance."). Instead, it can be considered sound trial strategy, especially "since the potential expert may uncover

evidence further inculpating the defendant." *State v. Telego*, 7th Dist. Mahoning No. 16 MA 0171, 2018-Ohio-254, ¶ 33.

{¶38} Ms. Simko argues that her trial counsel rendered ineffective assistance because her counsel failed to hire an expert to analyze the lack of blowback testing. She argues that such an expert would have been able to establish whether the .357 magnum was, in fact, the murder weapon, and whether she cleaned that gun, as the State insinuated given the lack of blood or DNA evidence on that gun. Ms. Simko's argument in this regard assumes that an expert would have provided an opinion favorable to her position. Mere speculation as to how an expert would have testified, however, "is insufficient to establish ineffective assistance." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, ¶ 119, quoting *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 217. Further, not only is Ms. Simko's argument based upon speculation, it ignores the fact that such an expert may have discovered evidence further inculpating her. *Telego* at ¶ 33. This Court, therefore, cannot say that Ms. Simko has established that her trial counsel rendered ineffective assistance by not hiring an expert to analyze the lack of blowback testing. Ms. Simko's fifth assignment of error is overruled.

III.

{¶39} Ms. Simko's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

JENNIFER HENSAL
FOR THE COURT

 

CALLAHAN, P. J.
CARR, J.
CONCUR.

APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J. D. TOMLINSON, Prosecuting Attorney, and BRIAN P. MURPHY, Assistant Prosecuting Attorney, for Appellee.