[Cite as *State v. Byrd*, 2024-Ohio-2134.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

SAMUEL LEWIS BYRD,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0029**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CR 00382

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*,* and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. John P. Laczko*, for Defendant-Appellant.

Dated: May 30, 2024

**DICKEY, J.**

{¶1}    Appellant, Samuel Lewis Byrd, appeals his conviction for one count of aggravated murder in violation of R.C. 2903.01(A) and R.C. 2929.02(A) (prior calculation and design), an unclassified felony, with a three-year firearm specification pursuant to R.C. 2945.145(A), following a jury trial in the Mahoning County Court of Common Pleas. In the early morning hours of June 15, 2022, Appellant, who was 68 years of age on that date, fatally shot 29-year-old father of four, Keimone Black ("Black"), at the Shell station on South Avenue near Interstate 680 in Youngstown, Ohio.

{¶2}    The indictment also charged Appellant with one count of having a weapon while under disability in violation of R.C.2923.13(A)(1)(B), a felony of the third degree, and sought a sentencing enhancement based on the repeat violent offender specification pursuant to R.C. 2941.149(A). The weapon charge and the violent offender specification were severed prior to trial, then dismissed by the state after the jury rendered its verdict.

{¶3}    Appellant advances four assignments of error.  In his first and second assignments of error, he challenges the sufficiency and the weight of the evidence supporting his conviction.  In his third assignment of error, he argues he received ineffective assistance of counsel. In his final assignment of error, he asserts the trial court abused its discretion when it instructed the jury on flight as evidence of consciousness of guilt.  For the following reasons, Appellant's conviction is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶4}    In addition to thirteen other witnesses, three eyewitnesses – James Davis ("Davis"), Jesse Shiflett ("Shiflett"), and Darren Boatwright ("Boatwright"), testified at trial on behalf of the state. None of them identified Appellant as the assailant. Further, the state did not offer evidence of Appellant's motive to commit the crime, and did not establish that any relationship existed between Appellant and Black prior to Black's murder.

{¶5}    Davis, a lifelong friend of Black, testified that Black retrieved Davis from work around 11:00 p.m. on June 14, 2022.  Black was driving Davis' Lincoln MKZ, which was a common occurrence because Davis typically worked very long hours.

**{¶6}** The friends bounced between two nightclubs that evening (Kings Court and Vibez) before deciding to attend an after-hours house party located near the Shell station. Davis described the evening as "all laughs and good times." (Trial Tr., p. 258.) He denied there was any "beef" between himself and anyone else that evening, or Black and any other person.

**{¶7}** Davis and Black purchased food at Kings Court, then Black stopped at the Shell station to eat and pass the time before the men attended the house party, which was scheduled to begin at 3:00 a.m. Davis, who was tired from a long day's work, fell asleep in the front passenger seat before they arrived at the Shell station, but told Black to wake him up when "[they] were ready to make the next move." (*Id.,* p. 250.) The MKZ was parked at gasoline pump number 4 (of 8) facing South Avenue.

**{¶8}** Davis testified he and Black often stopped at the Shell station after the local nightclubs closed, unless Davis had to report for work early the next morning. Tiffany Woolacott, a cashier at the Shell station at the time of the murder, testified a "rowdy crowd" assembled there between 2:45 and 3:45 a.m. after the nightclubs closed. (*Id.,* p. 267.) She further testified the customer entrance to the convenience store is triple-locked at midnight, which limits customer access to two drive-up/walk-up windows.

**{¶9}** Because Davis was asleep, he did not testify to the specific time he and Black arrived at the Shell station, or the amount of time that elapsed between their arrival at the Shell station and the events giving rise to this appeal. However, Davis speculated the MKZ was parked at the gasoline pump "somewhere between 30 and 45 minutes, with the time the bar let out to – because [they] stayed until closing, which was around 2:00." (*Id.* at 259). Davis testified he did awaken briefly at some point while parked at the gasoline pump, but he did not notice the time. He provided no explanation why the MKZ was parked at the gasoline pump.

**{¶10}** Davis testified he and Black did not have a specific pre-designed plan for the evening. In other words, they did not plan earlier in the day to go to the Shell station at approximately 3:02 a.m.

**{¶11}** At that time, Davis was awakened by a "loud bang," and then heard bullets striking the vehicle and shattering glass. (*Id.* at 251). Davis turned and saw Black "pretty much rolling out of the vehicle." (*Id.* at 252). Davis fled from the vehicle on foot and tried

to enter the convenience store, however the entrance doors were locked. Instead, Davis took cover behind a small brick wall, where he steadied himself then called emergency services. When Davis returned to the vehicle, he discovered Black had suffered four gunshot wounds to the right side of his body, including a fatal shot to his chest. Officers at the scene described Davis as "hysterical." (*Id.* at 254).

{¶12} Shiflett was a customer at the Shell station at the time of the shooting. Shiflett testified he was sitting in the driver's seat in his automobile at gasoline pump number 6 (facing the convenience store). Shiflett was playing with his mobile telephone while waiting for his companion, Dan Peterman ("Peterman"), to pre-pay for gasoline. Peterman was standing at one of the walk-up windows at the convenience store.

{¶13} Shiflett noticed a hooded figure walk from the rear of Shiflett's vehicle around the driver's side to the front of his vehicle. As the hooded man walked past the driver's side, he looked directly into the driver's side window at Shiflett. Shiflett described the man as black, balding, with a peppered beard, and at least fifty years of age. Because of the raised hood, Shiflett could not determine whether the man was simply balding or completely bald.

{¶14} After turning to walk in front of Shiflett's vehicle, the hooded man reached in his waistband with his right hand and removed a handgun. Shiflett testified he was "fully attentive" to the man with the gun, as he watched the hooded man walk over to the MKZ and shoot the driver through the passenger side window. (*Id.* at 284). Shiflett heard seven or eight shots fired. Seven spent shell casings were recovered from the crime scene.

{¶15} Footage from a surveillance camera located on top of the convenience store captured the crime. Two vehicles in addition to the MKZ and Shiflett's automobile are in the gasoline bay: a cream-colored automobile at gasoline pump number 5 (facing the convenience store), and a white automobile at gasoline pump number 8 (facing South Avenue). The cream-colored automobile is between the MKZ and Shiflett's automobile and the driver's side door of the cream-colored automobile is open the entire time.

{¶16} The white vehicle pulls into the gasoline bay at 03:01:29. The hooded man appears in frame at 3:01:50 walking from the northern side street, Dickson Street, toward the convenience store customer entrance. He leaves the frame, but footage from another

surveillance camera located inside the convenience store depicts the hooded man attempting to enter the convenience store, only to discover the customer service entrance doors are locked.

{¶17} He returns to the frame and walks directly past the passenger side of the MKZ. He turns his head and looks into the passenger side window as he passes. He turns right and walks behind the cream-colored automobile, past the pump, behind Shiflett's automobile (both are facing the convenience store), then he turns and walks past the driver's side of Shiflett's automobile. He turns his head and looks directly into the driver's side window.

{¶18} As the hooded man turns to walk in front of Shiflett's vehicle toward the MKZ, he draws a handgun from his waistband with his right hand. Immediately after the armed man approaches the front passenger side door of the MKZ, Shiflett starts his engine, makes a u-turn, and pulls out of the gasoline bay toward South Avenue, stopping at the boundary of the Shell station and the street.

{¶19} In the midst of firing seven or eight shots into the passenger side window of the MKZ (which is open half of the way), the gunman turns and begins to flee. As a consequence, three of the bullets are found in the back passenger side door. The 9 mm handgun used to kill Black was never recovered.

{¶20} The gunman runs toward Dickson Street, leaving the frame at 3:02.46. The driver of the cream-colored automobile closes his driver's side door and pulls out toward the southern side street. The white automobile, which is farthest from the MKZ does not move.

{¶21} Davis runs from the vehicle as Shiflett, who appears to have seen the gunman flee the scene, backs up and returns to the Shell station in order to find Peterman. Shiflett pulls into a parking space and can be heard yelling, "Dan!"

{¶22} Davis returns to the MKZ to discover his fatally wounded friend. Davis crawls through the driver's side door to retrieve something from the MKZ, then runs back out of frame. The white automobile slowly pulls toward, then past, the MKZ, and exits south to South Avenue.

{¶23} Boatwright, the owner of the house next to the Shell station on Dickson Street, testified he installed six exterior surveillance cameras around his residence. The

feeds appear on a television monitor in Boatwright's kitchen. Boatwright's surveillance system time stamp is behind roughly 1:03:00.

{¶24} Boatwright was awake when the fatal shooting occurred. Prior to the shooting, Boatwright noticed on the television monitor that an automobile pulled into his neighbor's driveway. He watched as a person exited from the passenger side of the automobile. The driver disabled the lights, then pulled out onto the street, and parked there.

{¶25} Boatwright watched the events on his television monitor in real time, as the person who exited the automobile walked to the Shell station. Hearing gunshots, Boatwright walked to his front porch, where he witnessed a "white guy" (Peterman) then a "black guy" running from the Shell station. (*Id.* at 352-354). Surveillance footage from the Shell station depicts Peterman running toward Dickson Street as the gunshots ring out, and the gunman following shortly thereafter. Boatwright then watched the "black guy" enter the front passenger side door of the parked automobile and the automobile drive away. (*Id.* at 355-356).

{¶26} One of Boatwright's surveillance cameras was trained on the driveway next to his residence. The footage from that camera captured the vehicle entering the neighbor's driveway at 1:59:00. The vehicle had no front passenger-side hubcap.

{¶27} Peterman, who fled from the crime scene down Dickson Street, sprints past Boatwright's house at 2:01:25. Eleven seconds later, the assailant walks past the house at 2:01:36.

{¶28} Lieutenant Robert Gentile and Detective Tony Vitullo of the Youngstown Police Department ("YPD"), were assigned to the murder investigation and reviewed the Shell station surveillance footage. Lieutenant Gentile explained he had the ability on his computer at the police station to "zoom in at different angles" and "slow [the footage] down frame by frame." With this technology, Lieutenant Gentile recognized Appellant as the gunman. (*Id.* at 590).

{¶29} Lieutenant Gentile was familiar with Appellant from his previous investigation of Anjuan Whitfield, who entered a guilty plea to manslaughter after fatally shooting a fourteen-year-old boy on January 13, 2022. As a result of the Whitfield investigation, Lieutenant Gentile was acquainted with Appellant's wife, Judy, who lived at

55 Ensley Drive in Campbell, Ohio as well as Appellant's girlfriend, Katrina Haskins (Whitfield's mother), who resided at 812 E. Avondale Avenue on the south side of Youngstown.

**{¶30}** Lieutenant Gentile testified he recognized Appellant because he "walk[s] a certain way" and "has an issue with his left wrist." (*Id.* at 593). Lieutenant Gentile observed in the surveillance footage that the assailant's left hand was curled up by his chest or the midsection of his body. Lieutenant Gentile further observed the assailant wore a wedding band on his left hand.

**{¶31}** Detective Vitullo noted the gunman had a cigarette in his mouth during the shooting. As a consequence, he searched the crime scene and discovered a discarded cigarette on the sidewalk where the getaway vehicle had been parked. Investigators retrieved the cigarette, which Detective Vitullo deduced was recently discarded as it was not weathered or trampled. Subsequent testing revealed Appellant's DNA on the cigarette. (*Id.* at 619).

**{¶32}** After identifying the getaway vehicle as a dark-colored Dodge Stratus manufactured between 1995-1999, a radius search of the surrounding five counties produced five results for a Dodge Stratus manufactured during that time frame. However, there was only one result for a Stratus that was dark in color. The vehicle captured in Boatwright's surveillance footage had no front passenger-side hubcap.

**{¶33}** The same automobile was the subject of a traffic report, which detailed an accident that occurred at the intersection of East Avondale Avenue and Gibson Street. At the time of the accident, the automobile was titled to Anjuan Whitfield, who resided at 812 E. Avondale Avenue, Katrina Haskins' address.

**{¶34}** Further investigation yielded the Dodge Stratus in question, which was missing the front passenger-side hubcap. The automobile was currently titled to a William Huffman, whose DNA was found on the driver's side of the vehicle. However, Appellant's DNA was not found in the passenger seat.

**{¶35}** Investigators visited the residence of Judy Byrd. She informed them that Appellant was employed at the Wal-Mart in Boardman, Ohio. Judy confirmed Appellant was off on Tuesday and Wednesday (the crime occurred at roughly 3:00 a.m. on Wednesday morning) of the then-current week.

**{¶36}** Investigators travelled to Wal-Mart and met with Jessica Straley, an asset protection manager, who supplied surveillance footage from both the interior and parking lot of the Boardman Wal-Mart. While viewing the Wal-Mart video, investigators confirmed Appellant wore a brace on his left wrist. He also appeared to be wearing the very same shoes (a dark mesh oxford with a thin light-colored sole) as the assailant in the Shell station surveillance footage.

**{¶37}** Through a conversation with Katrina Haskins, investigators learned Appellant was staying at the Boardman Inn. Appellant's automobile, a maroon Kia Sorento, was at Haskins' 812 E. Avondale address.

**{¶38}** Search warrants were executed at Judy's Ensley Drive address and Appellant's motel room. The searches did not yield any physical evidence of the crime.

**{¶39}** Officer Christopher Staley, the supervisor of the neighborhood response unit for YPD, which focuses on criminal interdiction, testified at trial. The neighborhood response unit coordinated with the detective division to apprehend Appellant at the Boardman Inn on June 17, 2022. While detectives were waiting for a search warrant for Appellant's motel room, Detective Sergeant Michael Cox, who was watching a live feed video from the motel complex, reported Appellant was entering a taxicab. As a consequence, the taxicab was surrounded and Appellant was forcibly removed.

**{¶40}** Lieutenant Gentile and Detective Sergeant Seann Carfolo conducted an interview with Appellant at the police station that same day (Friday). Appellant was wearing the same dark mesh oxfords with the thin light-colored soles. He was lethargic and yawned throughout the entire two-and-a-half-hour interview.

**{¶41}** After characterizing himself as a "veteran of the streets" at the outset of the interview, Appellant asked why he was being interviewed by homicide detectives. Lieutenant Gentile told Appellant that he had been captured "on video, shooting somebody" and asked Appellant if he was solicited to commit the crime. Appellant claimed he had a doppelganger named "Charlie Robinson" and people thought they were either brothers or twins. Appellant did not accuse Charlie Robinson of the crime, however Appellant speculated the individual in the video must simply resemble him.

**{¶42}** Lieutenant Gentile asked if Charlie Robinson had the same shoes as Appellant. Appellant responded by warranting that there was no blood on his shoes,

because he "ain't shot nobody." At the time, Appellant was not made privy to specific details surrounding Black's murder.

{¶43} Lieutenant Gentile explained "there are sixteen exterior cameras," and "cameras at the front door" at the gas station where the crime occurred, as well as "cameras on the streets next to it." He further explained the various videos were "so good," the viewer could see Appellant, his shoes, his wedding ring, the way he walks, the way he carries himself, as well as Appellant entering the getaway car.

{¶44} Thirty minutes into the interview, Appellant was given permission to smoke a cigarette. Investigators informed Appellant that he allowed the cigarette to dangle from his lips in the same manner as the assailant on the Shell station surveillance footage. Appellant asked if investigators collected a cigarette butt at the scene, and further, if they found his DNA.

{¶45} At one point during the interview, Appellant removed the brace from his left wrist, revealing that he suffers from the same physical defect as the assailant. Appellant also wore a wedding band on his left hand.

{¶46} Appellant stated he did not know "the guy what they said on the news." (Redacted Interview at 39:23.) When asked what he meant, Appellant said the television news had reported for the last couple of days that the victim was a young guy "in his early thirties or something", and he was the "fortieth homicide or something" in Youngstown that year. The state argues Appellant had not been informed of the specific shooting for which he was accused, however Lieutenant Gentile had previously told Appellant that "the gas station" where the crime occurred had sixteen surveillance cameras.

{¶47} When asked to explain why he was at the Boardman Inn, Appellant stated he was there with "Anjuan's mother and her girlfriend," and "you know what happens at hotels." When asked why he did not simply carry on at Katrina Haskins' house, Appellant responded because "they be shooting up her fucking house up too much." Appellant told investigators he was leaving the Boardman Inn in a taxicab to visit friends when he was apprehended.

{¶48} When Lieutenant Gentile asked Appellant where he was at 3:00 a.m. on Wednesday morning, Appellant first claimed he was asleep on the sofa seat at Judy's residence on Ensley in Campbell. Later in the interview, when asked if there would be

any reason he would be on the south side of Youngstown on Tuesday night, Appellant stated he stayed overnight at Katrina Haskins' home on East Avondale (despite his earlier claim that it was too dangerous to stay at her house). When asked a third time, Appellant reverted back to his original story, indicating he played cards with Judy until 1:00 or 2:00 a.m., then went to sleep on the sofa at her residence on Ensley. (*Id.* at 623). Mobile telephone records establish his mobile telephone was on the lower south side of Youngstown, in the same area as the Shell station.

{¶49} Appellant claimed he purchased gasoline in Campbell exclusively, giving as examples, the gasoline station on Wilson Avenue and the "Shell station on McGuffey." Lieutenant Gentile corrected Appellant that the gasoline station on McGuffey was a BP station. When Detective Sergeant Carfolo asked Appellant why he had "Shell on the mind," Appellant conceded he bought gasoline in Youngstown at the Shell station "on South Avenue," then Appellant quickly corrected his statement, saying "not South Avenue, Midlothian [Boulevard]."

{¶50} Lieutenant Gentile asked Appellant if he saw "the guy in the passenger seat." Appellant was clearly surprised by the inquiry. Appellant slowly repeated the question, then responded, "[t]hen I want to know one thing. Why didn't both of them get shot?" (Interview at 1:07:45.) Appellant was preoccupied with the existence of a passenger in the MKZ during the remainder of the interview, but explained that his interest was predicated upon the fact that there was no mention of a passenger in the newscoverage.

{¶51} A lengthy hypothetical discussion followed between Lieutenant Gentile and Appellant regarding the failure of the assailant to shoot the passenger. First, Appellant speculated in jest the passenger must have shrunk back into the seat thinking "[the assailant] ain't for me." Then, Appellant warranted, if he had been the gunman, "and there was two guys in the truck," the passenger would have been "collateral damage."

{¶52} Lieutenant Gentile asked Appellant how he knew the victim was in a truck, and Appellant replied, "[it is] on the news." Then Lieutenant Gentile asked, "you [did not] see [the passenger,] did you?" Appellant responded he would have had to have "x-ray vision eyes" to see the passenger because his eyes were shut at home at the time of the murder.

{¶53} Next, Appellant stated "if I had did a job like that, I would have got the passenger first, nope, [unintelligible] if he was [the] mark, I would go on the driver's side and then get the passenger." (*Id.* at 1:10:12.) Appellant asked if the passenger was across the street, then suggested, "if there was a passenger, bring him in here and tell him to [identify] me."

{¶54} Later, Appellant said, "if the passenger was there, and I came around, speaking, and I saw a passenger, and the passenger saw me, I would go around to the driver's side and shoot, but if the passenger was the mark, then his ass was out." (Sam Byrd 2 at 21:50.) Lieutenant Gentile told Appellant that he had just said something only the shooter would know (referring to the undisclosed fact that the driver was shot from the passenger side). A few minutes later, Appellant asked, "why didn't [the assailant] go over to the driver's side to shoot. Which way did he come, did he come from the driver's side or the passenger side?"

{¶55} Defense counsel argued at trial that the investigation was incomplete, because Lieutenant Gentile focused exclusively on Appellant, following Lieutenant Gentile's identification of Appellant on the surveillance footage. Defense counsel further argued the state intentionally avoided collecting potentially exculpatory evidence.

{¶56} Despite surveillance footage depicting Appellant attempting to enter the convenience store, investigators conceded they did not lift fingerprints from the customer entrance door. Lieutenant Gentile further conceded on cross-examination that investigators did not arrange a line-up in order to determine whether Shiflett or Boatwright could identify Appellant. Lieutenant Gentile claimed Peterman, a fourth potential eyewitness, refused to participate in the investigation due to fear.

{¶57} Further, Appellant's DNA was not found on the seven shell casings collected at the crime scene or on the passenger side of William Huffman's Dodge Stratus. Lieutenant Gentile testified he spoke with William Huffman, but Lieutenant Gentile did not believe William Huffman was the getaway driver.

{¶58} With respect to another suspect, defense counsel pointed to an unidentified man in the Boatwright surveillance footage (#6_06_R – his neighbor's driveway), who walks past Boatwright's residence toward the Shell station at 1:44:45 (2:46 a.m.) The man appears to be wearing a dark hoodie and a mask. However, the man reappears

walking in the opposite direction at 1:45:15. The man switches direction a second time and walks toward the Shell station at 1:46:02. Smoke billows from his mouth. The man appears a fourth time at 1:46:46 walking away from the Shell station.

{¶59} The defense also offered a photograph of an older black man with some grey facial hair, taken from William Huffman's Facebook page. The man is wearing a baseball hat, so it cannot be determined whether he is balding or bald.

{¶60} Defense counsel made an oral motion for acquittal at the close of the state's case, which was summarily overruled. The defense rested without offering any evidence. Defense counsel failed to renew the Rule 29 motion until after closing arguments. As a consequence, the trial court overruled the renewed motion.

{¶61} The jury found Appellant guilty of aggravated murder, with the accompanying firearm specification. Appellant was sentenced to a prison term of life without the possibility of parole, consecutive to the mandatory three (3) year term for the firearm specification. This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED AS A MATTER OF LAW AND TO THE PREJUDICE OF APPELLANT BY DENYING APPELLANT'S MOTION FOR ACQUITTAL AS INSUFFICIENT EVIDENCE WAS PRESENTED AT TRIAL TO SUPPORT A GUILTY VERDICT.**

{¶62} Appellant was convicted of R.C. 2903.01(A), which provides, in relevant part: "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." Appellant argues the state presented insufficient evidence that he acted with prior calculation and design.

{¶63} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. Jefferson No. 07 JE 45, 2009-

Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955), reversed on other grounds. When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. Mahoning No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. Jefferson No. 09 JE 26, 2011-Ohio-1468, ¶ 34.

**{¶64}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.* Where reasonable minds can reach different conclusions upon conflicting evidence, the determination as to what occurred is a question for the trier of fact. It is not the function of the appellate court to substitute its judgment for that of the factfinder. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, ¶ 27, 182 N.E.3d 1161.

**{¶65}** The legislature intended the element of "prior calculation and design" to require more than mere instantaneous or momentary deliberation. *State v. Kerr*, 7th Dist. Mahoning No. 15 MA 0083, 2016-Ohio-8479, ¶ 20. Prior calculation requires evidence "of 'a scheme designed to implement the calculated design to kill' and 'more than the few moments of deliberation permitted in common law interpretations of the former murder statute.' " *Id.* Nonetheless, prior calculation and design can be found where a defendant "quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), citing *State v. Palmer*, 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685 (1997).

**{¶66}** A finding of prior calculation and design is evaluated on appeal based on the totality of the circumstances and on a case-by-case basis. *Id.* at ¶ 21. When reviewing whether prior calculation and design is established, Ohio courts analyze several factors. *State v. Carosiello*, 7th Dist. Columbiana No. 15 CO 0017, 2017-Ohio-8160, ¶ 33. These non-exclusive factors include whether the defendant and victim knew each other, if the relationship was strained, whether the defendant gave thought in choosing the murder weapon or site, and whether the act was drawn out or sprung from an instantaneous

eruption of events. *Id.*, citing *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 56-60.

**{¶67}** Defense counsel made an oral motion for acquittal at the close of the state's case without advancing any argument. The trial court opined:

> The only issue here is the issue of prior calculation and design. [The Court has] carefully examined evidence relative to that, and a trier of fact could infer that there was prior calculation and design, but there was no direct evidence of it. But [that is] not the test.
>
> The test is that the Court has to construe the evidence in its most favorable light to the state, and at this point ask and inquire whether reasonable minds would differ.
>
> The Court finds that they would; and, therefore, the motion is overruled.

(Trial Tr., p. 784-784).

**{¶68}** Appellant argues the eyewitnesses did not identify Appellant as the assailant, and the state failed to offer any evidence of motive or a relationship between Appellant and Black. Further, Appellant alleges the shooting was an "instantaneous eruption of events," rather than the result of a design or scheme, based on Davis' testimony that there was no "beef" with any of the other nightclub patrons on the evening of June 14, 2022.

**{¶69}** To the contrary, we find there is ample evidence of a scheme designed to implement the calculated design to kill in the record. The getaway vehicle was parked within walking distance of the crime scene, but a sufficient distance to obscure the vehicle from the view of the Shell station patrons and surveillance cameras. Appellant, armed with a firearm, exited the getaway vehicle after the vehicle lights were turned off, walked through the parking lot past the MKZ, looked intently into the passenger side of the vehicle, then surveyed the remainder of the vehicles in the gasoline bay, before returning to the passenger side of the MKZ and firing seven shots at the MKZ. Finally, there was no precipitating event immediately preceding the shooting.

{¶70} Appellant correctly argues the state offered no evidence of motive or prior relationship between the victim and assailant. Nonetheless, the evidence in the record establishes a scheme designed to implement the calculated design to kill, which required more than the few moments of deliberation. Accordingly, we find there is sufficient evidence to support Appellant's aggravated murder conviction and Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL.**

{¶71} Weight of the evidence concerns the effect of the evidence in inducing belief, and appellate review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins, supra,* 387. When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins* at 387. Where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins* at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution.

{¶72} The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389. "[T]he

weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "[Appellate courts] therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, [the appellate court does] not choose which one [ ] is more credible." *State v. Carter*, 2017-Ohio-7501, 96 N.E.3d 1046, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist. 1999).

**{¶73}** Appellant cites the lack of eyewitness identification, as well as the lack of investigation regarding any other suspects, to conclude the jury's verdict is not supported by the weight of the evidence. However, there exists other compelling evidence in the record of Appellant's guilt.

**{¶74}** Lieutenant Gentile testified he had a prior relationship with Appellant, and through the use of computer technology, Lieutenant Gentile was able to identify Appellant based on the surveillance footage. Further, Appellant fit the description provided by Shiflett, and suffered from a similar physical defect and wore a similar pair of shoes as the assailant.

**{¶75}** During the police interview, Lieutenant Gentile commented Appellant's cigarette dangled from his mouth in a similar fashion to the assailant's cigarette in the surveillance footage. Appellant asked if a discarded cigarette was found at the scene and if it contained his DNA. A discarded cigarette was found on the sidewalk where the getaway car was parked, and it did contain Appellant's DNA.

**{¶76}** Appellant provided conflicting stories regarding his whereabouts on the night in question. Further, although Appellant's DNA was not found in the passenger side of the Dodge Stratus, the vehicle was previously associated with Katrina Haskins' son.

**{¶77}** During the police interview, Appellant was rattled when he learned there was a passenger in the MKZ. In a series of hypotheticals, Appellant appeared to reveal his knowledge of the peculiar location of the assailant when he shot Black. Finally,

Appellant's mobile telephone records placed him on the south side of Youngstown, which is where the Shell station is located, when the crime occurred.

**{¶78}** Based on the foregoing evidence, we find the jury did not clearly lose its way in convicting Appellant. We further find Appellant's second assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3

**APPELLANT CONTENDS HE RECEIVED INEFFECTIVE ASSISTNACE OF COUNSEL THROUGHOUT THE JURY PRETRIAL PROCEEDINGS, VOIR DIRE, THE JURY TRIAL AND AT THE SENTENCING HEARING IN THE INSTANT MATTER IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS AS WELL AS HIS RIGHTS UNDER SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION.**

**{¶79}** In order to demonstrate ineffective assistance of counsel, Appellant must show that trial counsel's performance fell below an objective standard of reasonable representation, and prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both prongs must be established: If counsel's performance was not deficient, then there is no need to review for prejudice. Likewise, without prejudice, counsel's performance need not be considered. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶80}** In Ohio, a licensed attorney is presumed to be competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential as there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Appellate courts are not permitted to second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

**{¶81}** Even instances of debatable strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407

(1987). The United States Supreme Court has recognized there are "countless ways to provide effective assistance in any given case." *Bradley* at 142, citing *Strickland* at 689.

**{¶82}** To show prejudice, a defendant must prove his lawyer's deficient performance was so serious that there is a reasonable probability the result of the proceeding would have been different. *Carter* at 558. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley*, 42 Ohio St.3d 136 at fn. 1, 538 N.E.2d 373, quoting *Strickland* at 693. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair as a result of the performance of trial counsel. *Carter*, 72 Ohio St.3d at 558, 651 N.E.2d 965, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

**{¶83}** Finally, an ineffective assistance of counsel claim cannot be predicated upon supposition. *State v. Watkins*, 7th Dist. Jefferson No. 07 JE 54, 2008-Ohio-6634, ¶ 15. In other words, where evidence outside the record is required to demonstrate deficient performance or prejudice, the claim cannot be asserted on direct appeal. Likewise, proof of ineffective assistance of counsel requires more than vague speculations of prejudice. *Id.* at ¶ 55, citing *State v. Otte*, 74 Ohio St.3d 555, 565, 1996-Ohio-108, 660 N.E.2d 711.

**{¶84}** Appellant cites several instances of ineffective assistance, which we group together for clarity of analysis. Appellant contends defense counsel should have hired a shoe expert and an identification expert to counter Lieutenant Gentile's testimony regarding his identification of Appellant as the assailant. Appellant further argues defense counsel should have offered Appellant's medical records, which were subpoenaed by defense counsel, into evidence at the trial.

**{¶85}** We addressed similar arguments of ineffective assistance in *State v. Telego*, 2018-Ohio-254, 104 N.E.3d 190 (7th Dist.), where we opined:

> "[T]he failure to call an expert and instead rely on cross-examination does
> not constitute ineffective assistance of counsel." *State v. Hunter*, 131 Ohio
> St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66; *State v. Hartman*, 93 Ohio
> St.3d 274, 299, 754 N.E.2d 1150 (2001); *State v. Nicholas*, 66 Ohio St.3d
> 431, 436, 613 N.E.2d 225 (1993). Even if the wisdom of this approach is

debatable in a particular case, it must be remembered that debatable trial tactics require deference to counsel's judgment. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). It is often pointed out defense counsel's decision not to engage its own expert can be considered tactical since the potential expert may uncover evidence further inculpating the defendant. *See, e.g.*, *Hartman*, 93 Ohio St.3d at 299, 754 N.E.2d 1150. *See also State v. Phillips*, 6th Dist. No. WD-16-020, 2017-Ohio-7107, 2017 WL 3382098, ¶ 48; *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691, ¶ 90 (10th Dist.).

*Id.* at ¶ 33.

**{¶86}** The same is true here. Appellant's ineffective assistance arguments are predicated upon the supposition that the proposed testimony and evidence would have helped rather than hindered the defense. Because our determination of deficient performance and prejudice turns on evidence outside of the record, we cannot consider this aspect of Appellant's ineffective assistance claims on direct appeal.

**{¶87}** Next, Appellant asserts his trial counsel was ineffective for failing to request jury instructions on the lesser-included offense of murder. Defense counsel's failure to request instructions on lesser-included offenses is often a matter of trial strategy and does not per se establish ineffective assistance of counsel. *State v. Griffie*, 74 Ohio St.3d 332, 658 N.E.2d 764 (1996), citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶88}** Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). Here, defense counsel may have chosen to defend the aggravated murder charge based on the lack of motive and any prior relationship between Appellant and Black in order to achieve an acquittal rather than a conviction of the lesser-included offense. Accordingly, we find no deficient performance.

**{¶89}** For the foregoing reasons, we find there is no evidence of ineffective assistance of counsel in the record. We further find Appellant's third assignment of error has no merit.

**ASSIGNMENT OF ERROR NO. 4**

**THE TRIAL COURT ABUSED ITS DISCRETION BY GIVING THE JURY A CONSCIOUSNESS OF GUILT, EVIDENCE OF FLEEING JURY INSTRUCTION WITHOUT SUFFICIENT EVIDENCE.**

**{¶90}** Based on Appellant's efforts to leave the Boardman Inn by way of a taxicab, the state requested a flight instruction. Defense counsel objected to the flight instruction, arguing there was no physical evidence of any intent to leave the jurisdiction, i.e., no suitcases or bus ticket. During the police interview, Appellant claimed he was leaving the motel to visit friends. The trial court rejected defense counsel's arguments, and provided the following instruction to the jury:

> Testimony has been admitted indicating that the defendant fled the scene. You are instructed that fleeing the scene alone does not weigh the presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.
>
> If you find that the facts do not support the defendant leaving the scene or if you find that some other motive prompted their conduct, or if you find that, or if you are unable to decide what his motive was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support that the defendant engaged in such conduct, and you decide that it was motivated by consciousness of guilt you may, but are not required to consider that evidence in deciding whether or not he is guilty of the crime charged. You alone will determine what weight, if any, to give to this evidence.

(Trial Tr., p. 831-832.)

**{¶91}** A flight instruction is considered within the context of the entire set of jury instructions. *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus. A jury instruction is proper when: (1) relevant to the facts presented; (2) it

Case No. 23 MA 0029

provides the correct statement of the relevant law; and (3) it is not already covered in the general charge to the jury. *State v. Sharpe*, 7th Dist. Mahoning No. 22 MA 0021, 2023-Ohio-2570, ¶ 60, appeal not allowed, 171 Ohio St.3d 1456, 2023-Ohio-3670, 218 N.E.3d 973, ¶ 60. The Ohio Supreme Court has consistently held the fact of the accused's flight is admissible as evidence of the accused's consciousness of guilt and, thus, of guilt itself. *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750; holding reaffirmed by *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997).

**{¶92}** "When trial counsel files a timely objection to jury instructions pursuant to Crim.R. 30, a reviewing court will not reverse the trial court's decision in the matter absent an abuse of discretion." *State v. Italiano*, 7th Dist. Mahoning No. 19 MA 0095, 2021-Ohio-1283, ¶ 9, appeal not allowed, 163 Ohio St.3d 1496, 2021-Ohio-2270, 169 N.E.3d 1283, ¶ 9; *State v. Taylor*, 7th Dist. Mahoning No. 08 MA 122, 2010-Ohio-1551, ¶ 26; *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). Generally, a trial court has broad discretion as to jury instructions, but must "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *Italiano* at ¶ 9, citing *State v. Comen*, 50 Ohio St.3d 206, 210, 553 N.E.2d 640 (1990).

**{¶93}** Unlike traditional evidence of flight, Appellant's conduct at the Boardman Inn is susceptible to two interpretations. However, the instruction clearly provides the jury may reject the state's interpretation of Appellant's conduct. Further, even if the jury agrees Appellant's conduct is evidence of consciousness of guilt, they are not obligated by the instruction to consider it in rendering their verdict. Given the wide latitude provided by the instruction, we find the trial court did not abuse its discretion by instructing the jury on flight.

**{¶94}** The Tenth and Second Districts have reached the same conclusion with respect to the flight instruction. The Tenth District has observed "the instruction [is] neutral in its effect, providing that the jury may, but [is] not required to, consider evidence of Jones' conduct in deciding whether Jones was guilty of the crime charged." *State v. Davenport*, 10th Dist. Franklin No. 18AP-393, 2019-Ohio-2297, ¶ 55. Similarly, in *State*

*v. White*, 2d Dist. No. 26093, 2015-Ohio-3512, the Second District found a flight instruction "all but innocuous." *Id.* at ¶ 51. The Second District opined:

> [The flight instruction] explains the limited use of the flight evidence and clearly says that the jury may consider [the defendant's] flight only if it finds that he was 'motivated by a consciousness or awareness of guilt.' And even if the jury finds that this motivated him, the instruction says that it still is not required to consider the flight evidence.

*Id.*

**{¶95}**  Here, as in the cited cases, the jury was instructed they could, but were not required to, consider Appellant's conduct even if they concluded it was motivated by consciousness of guilt.  Because the instruction exclusively vests in the jury both the credibility determination (Appellant's stated purpose for leaving the motel in a taxicab) as well as its relevance to Appellant's guilt, we find the trial court did not abuse its discretion. We further find Appellant's fourth assignment of error has no merit.

## CONCLUSION

**{¶96}**  For the foregoing reasons, Appellant's conviction is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

Case No. 23 MA 0029

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**